My name is Evelyn Alfonso. I'm representing the petitioner, Mr. Romeo Mapalad, and Your Honor, may I request two minutes to reserve for my rebuttal? The issue before us is whether the petitioner was able to establish a well-founded fear of persecution. Petitioner Huy Yen was able to satisfy and establish both subjective and objective fear of persecution. He served as an informer for the government. He started working as an informer for the government in 1984 when he was asked by the then Commander-in-Chief of Police of Makati, Manila, Philippines, to ask as an informer and to use his affiliation with the Jitney Drivers Association, like a taxi drivers association, to be able to track down the illegal activities of the New People's Army, commonly called as the NPA, which is a communist terrorist party in the Philippines. Because of his information, which he directly gave to the Commander-in-Chief, they were able to make arrests made by the Commander-in-Chief and they were able to regulate and track down the illegal activities of this NPA. However, in 1999, his protector, the then Commander, was assassinated openly in a public market, thereby causing fear that since he is the direct source of information by this Commander-in-Chief of Police, the next target would be him. Anybody in his position and considering the circumstances will definitely believe that he is now facing a fear of persecution. His fear of persecution is further corroborated by the newspaper article which the petitioner submitted in evidence in here. In that newspaper article, it was declared that the cause of the assassination of the then Commander-in-Chief, whose name is General Tyler, was because of the NPA's assassination, made specifically by the SPARRA unit. And months after that, the petitioner received also threats, sort of like a gift from an unknown person, that gave him a black barong, which petitioner believed that that is a symbol of death for coming. Because of his fear, he left his residence and fled to the different parts of the country. His ‑‑ Well, at that point, there seemed to be some conflict, at least initially in the record, about whether or not the black barong came from drug dealers, NPA, or perhaps the NPA had taken over the drug dealing operation. What is your position on that? Well, our position is that because of the circumstances, his affiliation directly to the Commander-in-Chief and the timing of his receiving that gift was like after the Commander-in-Chief was assassinated. Then he believes that he would be the next target, that that is a sign or a symbol that he is the next target. Especially that in the newspaper, it says there that war is in, war is going on, and more people will be hurt. And that is a reasonable basis to believe that he is facing a fear of persecution. But I guess the issue is whether it was the drug dealers who were threatening this or whether it was the NPA. Basically, Your Honor, the main objective why he was taken as an informer is for him to track down the illegal activities of this NPA. Illegal activities of NPA could include so many things. It could include killing of people. It could include drug trafficking, just to maintain power and to control, because that is what is happening in the Philippines right now, too. After he left his home, his testimony was that he stayed in various places for a number of years. Is that right? Yes. And the IJ found that incredible, that one would spend no more than a week in one place for a period of a number of years. How do you respond to the IJ's objection? I think in the testimony of the petitioner, he testified that he's just waiting for the right time. So his action is like to exhaust all the means that he could do to stay in the country, because he doesn't have financial means to leave the country. It was only later on when he had the chance that he took the opportunity and fled out of the country. Okay. Anything else you want to add? Do you want to save some time for the bottom? No, you can. I don't mean to stop your argument, if you have more to say, but you might want to save some time for your bottom line. Yes. Thank you so much. Yes, you bet. May it please the Court. Victor Lawrence for the Attorney General. This Court should deny this petition for review. This individual had an opportunity to try to present a credible claim of asylum, first before an asylum officer, then before an immigration judge in two to three hearings, and then again before the Board of Immigration Appeals. None of those bodies believed that Mr. Mopillot was credible. None of them believed that he had satisfied his burden of proof for asylum. And this Court reviews those, the Board's and the immigration judge's opinion here for substantial evidence. Accordingly, it shouldn't reverse unless it feels that any reasonable fact finder would be compelled to conclude to the contrary. Tell us, Counsel, exactly what led to the lack of credibility finding on any material issue. Sure, Your Honor. I took it a little bit differently than Your Honor did with respect to the reason the immigration judge found him incredible. No, that was one of the reasons. I'm just saying. I think that was said actually by the Board, wasn't it? Well, it's related, and let me explain. The issue of what Mr. Mopillot was doing in the country for the last two years in the Philippines, after he received this death threat, it goes indefinitely to the heart of his asylum claim. Supposedly, he received a black barang, which, by the way, was four months after the chief of police, Mr. Taylor, was assassinated. Four months later, the record shows he was at a birthday party and he received a black barang. Then, supposedly, pardon me, he took that as a threat on his life, and he moved around the country, and the testimony is, his oral testimony of that asylum hearing, was that every four or five days he went to a different place because he feared for his life. But what the immigration judge found more incredible, I believe, is not just this concept of moving four to five days because of his fear, but how that fact was completely inconsistent with his biographical information that was provided in his asylum application, which stated that for the last two years of his time in the Philippines, he was a personnel manager for Absolute Beauty Systems, a beauty supply company, and that he was a businessman, as he had on his passport. Conflict that, this idea of him being a businessman and being a manager for a beauty supply company, with moving every four or five days in fear for his life. Now, you look at that information and you say, well, okay, did the immigration judge reasonably explore whether this is an inconsistency? And the answer is yes. He looked at that and he quizzed the Petitioner for 12 or 14 pages in the record, exactly what he was doing during this time. And he couldn't get any resolution to it to his satisfaction for him to feel that the Petitioner was giving him credible information. The issue of what he was doing in the country for the last two years, after he supposedly was in fear for his life, it goes directly to the heart of his claim. And that is a specific and cogent reason that the immigration judge pointed out and the Board of Trustees. So why does it go to the heart of the claim, though? How does it, you ask? Yes, explain. Okay. His claim of past persecution is based on the Black Barong and his activities before that. Well, I'm sorry to interject, but he doesn't make a claim for past persecution. He's only claiming well-founded fear. In the record. All right. Well, let's just say the primary evidence on which he relies for the basis of his well-founded fear has to do with the Black Barong. Yes. And his testimony. So tell me, why do the episodes after that inconsistencies go to the heart of his claim? Because what you're looking at here is why did this individual leave the Philippines for the United States? His claim is he was in fear for his life that he was going to be persecuted by the NPA. That's his claim. Now, you have to consider two things. He was in the country for some two years after he received that supposed death threat, the action that he perceived to be a death threat. He was in the country for two years after that. Now, he claims, on the one hand, that during that time he was living in fear for his life and moving all over the place. So he couldn't be found. On the other hand, he's claiming, well, during that time from 1988 to 1991, expanding even a year further back, he was a personnel manager for this particular company. He was a businessman. This is what his passport says. What he is doing after he's in fear for his life goes directly to the heart of his claim. I think no matter what, if you're trying to say that you're scared that you're going to be persecuted on one of the enumerated grounds, you have to establish that fear. And anything that you do in response to that fear goes to the heart of your claim. He gave some explanation of his supposed job, isn't that correct, that he just did contacts with the government and it was really kind of a favor from a friend? Excuse me. He did try to give an explanation of the job. He did give the explanation. And the question is whether it was believed or believable. Yes. But I point out that in giving his explanation, he contradicted himself a couple times. And we point that out in our brief. First, he says he was only used as a reference. Then he says he had no contact with them after 1989. Conversely, his application says he worked for them straight through 1991. So the immigration judge. Say again what you think the contradiction is. Okay. When the immigration judge asked him what you were doing during that time, first he said he was only used as a reference for this absolute And at one point he said he worked for them for two months. And this is all in our brief. At one point he says he worked for them for only two months. Then he says that he was used as a reference the entire time from 1988 to 1991. His application. That's not a contradiction. One, it says he worked for two months, but his name was used as a reference for the whole period. That's not contradictory. Well, but it is when you combine that with the fact that his passport indicates that he was a businessman during that entire period. No. What evidence is this? Where does the businessman come from? His passport indicates that he was. And the immigration. Oh, no. The passport, I tell you, gives his occupation. It doesn't tell you what he's actually doing. I mean, anybody gets a passport, it's there for eternity until you get a new passport. But here's the point, Your Honor, if I may. You may sit here and say to yourself, and reasonably so perhaps, that, well, is that really a contradiction when he tried to explain this? Well, in the immigration judge's view, when he was there examining the demeanor of this individual, he determined that it was a contradiction and that the person was not persuasively explaining what he was doing during that last two years when he was supposedly in fear for his life. This Court should accept the immigration judge's finding on adverse credibility unless any reasonable fact finder would be compelled to conclude to the contrary. Not just that it's possible that there wasn't a contradiction here, but that the evidence clearly shows that there's nothing here that there's contradictory. I don't believe that's the case on examination of this record. Well, tell us again why it's contradictory. You haven't made it clear. Okay. I'll do my best. Basically, the contradiction is that in the last two years after he received this death threat, on the one hand, he's saying that he moved around every four or five days. He couldn't stay in the same place. He was moving around for two years doing that. On the other hand, his application and his passport, but I understand your point, passport says he's a businessman. His application says he's a personnel manager for Absolute Beauty Systems. The immigration judge pointed out that a personnel manager, that's a very responsible job. You have to be, you know, in the flex of things, being able to manage this company. But at the same time, he says, well, no, I wasn't really managing the company. I wasn't really a personnel manager. I was only used as a reference. And then he says also that he was doing that for two or three years. At one point he says he had no contact with the company after 1989. All this stuff together, the immigration judge has determined he's not reasonably explaining the inconsistency. The inconsistency being whether he was in fear for his life for those last two years or whether he actually had a job in the Philippines doing a personnel management business. Is there any doubt about the fact that he wasn't an informant for quite a few years? The only doubt is that the immigration judge did find adversity on his credibility. So how far that stretches, whether he believed everything, is not clear. But I guess the question is, is there any reason to doubt that? There's no reason to doubt that he may have been an informant. But what he was informing about, there is plenty of reason to doubt. Well, yes, that's another issue. But if, in fact, he was an informant, it's common sense that the NPR would get him if they could. Yeah, but, you know, first of all, by his own testimony, which is contradicted both at page 113 and 114 and then again at 139 and 140, he couldn't adequately say who gave him this black barong because he doesn't know. All he knows is that – He testified later, though, that the black barongs come from the NPA. And that's – we've seen other cases. That is a common means of communicating a death threat there. Okay, but at page – Right, right. He says – the first hearing, he's confused. He doesn't know whether it comes from the drug dealers or the NPA. And at one point, he says the NPA has taken over the drug dealers. In the second hearing, he says the NPA is the only one who used the black barong. Is that – am I accurately reflecting what the testimony was? That's pretty close, yes. Okay. But in my view, that indicates to me that he's not exactly sure where he got the barong from. Right. I just want to make sure I had the facts right. So if he was an informant to this chief of police, there's nothing to show that he was doing this on the basis of political opinion as opposed to just ratting on people who were drug dealers. And one thing that I thought was very telling in the record at page 143 was when he was specifically asked, well, what do you have – what's your political conflict with the NPA? And he says, well, I don't like communism or something like that. And then the immigration judge says, can you define what communism is? Couldn't do it. Well, actually – It's in a case of imputed opinion. Yeah, well, we care about what the NPA thought. Okay, well – No, seriously. I mean, I always took this as a case of imputed political opinion. He didn't express an opinion anywhere I didn't see except informally. So the question is, did they impute a political opinion because of his support of the government and ratting on the NPA? Okay. I understand your position. But I'd go back again – So assuming that it's a case of imputed opinion, how is your response to that in terms of addressing it? Because to get to what Judge Fletcher is saying, it would seem fairly logical that if you're assisting – if you take his testimony as credible – I know you don't – but if you take his testimony as credible, he's assisting the government in trying to rat out the NPA. The NPA assassinates the person to whom he's informing. I think that the very fact that there is a four-month gap between the time that the chief of police was assassinated and the time that he got the splat wrong eliminates any nexus to show that there's some relationship between these two events. Four months later is a long time, and there's no indication that they didn't know where this guy was for the four months prior. So you have to say to yourself, well, has he borne his burden of proof on asylum to show that there is this nexus between getting this splat wrong and knowing that that's a threat on the basis of political opinion, given this substantial gap in time, or was somebody after him because he was simply ratting out drug dealers? As the petitioner testified, he was strongly against drug trafficking, and that's the reason why he initially became an informant with the chief of police. The asylum applicant bears the burden of proof. It wasn't born here. But I think that the adverse credibility determination, I only mentioned one. I mentioned the main inconsistency, which I believe is what he was doing in the last two years after he received that black baron. The other inconsistency, which the immigration judge pointed out, which I would concede is a little lesser, but I think it still goes to the heart of his claim, is how did he get to the United States? How did somebody who's fleeing persecution because they fear for their life actually get to the United States? I believe that's an issue that goes to the heart of your asylum claim. How the matter in which you escape persecution certainly goes to the heart of your claim. He couldn't respond to the immigration judge's reasonable inquiries. How did he get a nonimmigrant visa? He did respond and say that he got it through his friend Patricia Beltran. I don't want to misrepresent the record. So the immigration judge didn't believe him. I just don't understand that part of your argument because he was working for the government and certainly he'd have all kinds of means to get out of the country. Well, all we know is that he was an informant for this chief of police who's now dead. So whether he had any other contacts with the government after that chief of police died, there's no indication whatsoever in the record that he did. Well, he did say that he was doing some work for the government, didn't he? What would be the impediment? Obviously, the NPA might want to get him before he left, but the government would have no motivation to keep him from getting a passport and getting out of the country. Well, I'm not saying that there would be an impediment necessarily to him getting out of the country, but the idea that he couldn't reasonably explain it to the judge, you know, how did you get your visa to get out of the country when the immigration judge is looking at a passport which doesn't have the nonimmigrant visa and he can't figure it out and the guy claims that the immigration inspector took his visa because it was about to expire. I believe that was his claim in the record. The immigration judge listened to his explanation, quizzed him about it for several pages in the record, gave him a chance to try to explain the inconsistency. And to the immigration judge's satisfaction, he didn't do it. And, again, this is another issue. I guess the question is why does that – assuming that there's some inconsistencies there, assuming that maybe you got it through some improper means in the Philippines, why does that go to – I don't understand what that has to do with the heart of the claim. The heart of the claim is that he was fleeing persecution. Yeah. And when you're – the issue of how you are fleeing persecution goes to the heart of your claim. I mean – Why we have a lot of people that come here legally and illegally claiming they're fleeing persecution. And I don't think I've ever heard a claim that the manner in which you flee really goes to the heart of the claim, whether it's past persecution. I'd give you a case that's a little bit close. It's called FARAH, F-A-R-A-H. I'm sorry. I don't have a site. FARAH versus AFRA, 348 F3rd 1153 at 1155. Where it discusses the date of entry. Something as simple as whether the date of entry in the United States is something that goes to the heart of your claim. Well, in some cases it would, because it wouldn't be how long you'd been here. Okay. Well – I think I wouldn't press this claim, counsel. Yeah, if that's your – you don't want to put your eggs in the house. No, no, no. But I merely wanted to point out another inconsistency. But I think the major inconsistency is what he was doing in the two years after he supposedly was in fear for his life. Yes, we take your point on that. Okay. All right, thank you, Your Honor. Yeah, thank you. Your Honor, the Immigration Service is questioning the credibility of the petitioner. But they are emphasizing the point of the departure, the timer, of the petitioner to the United States. The issue before us is whether the petitioner was able to establish a rational basis, which is the required standard of review, in establishing whether his claim for persecution is well-founded. He was an informant. The service and even the records would show that this part, that he worked as an informant, was not refuted. It was not also refuted that the petitioner was able to submit a newspaper article to corroborate his fear of persecution, that he might be the next target. Because in the newspaper it's stated there that war is forthcoming, more people would be hurt, and that there is a conspiracy between one member of the Ditney Drivers Association and the one who killed or assassinated the general to whom the petitioner is directly reporting. So what about the evidence that he was working and was the personnel manager of a company for a couple of years? As stated in his biographic data. What's that? Biographic data and in the passport of the petitioner, he said that that is a friend who asked his favor. I know that, but if he was the personnel manager, wasn't he pretty visible? Well, it could be, perhaps, Your Honor, but it's also possible that I can work as a personnel manager by supervision and be out of the office, not for the whole eight hours of the day. You can be, but we're operating with a standard where we have to find that we're compelled to come to a different conclusion than the immigration judge did. Now, the immigration judge looks at this evidence that he was a personnel manager. Yes, Your Honor, but I think the issue here that's material in the disposition of this matter is whether the statement or the claim of the petitioner as to his claim was rationally supported by evidence, and that part of the testimony was not refuted. Well, how does his explanation explain how he operated as a personnel manager and was invisible? If you would note, Your Honor, when he was working as a personnel manager, it was already after, after the threat was made to him, but he still fears that since the NPA is just around the country, and even up to now, it could still happen to him that he would be persecuted. That's why he waits for the timing. But the government says now his explanation is inconsistent. He says at one point, I only worked two months and my name was used as a reference. On the other hand, he says he was a personnel manager. Those seem to be contradictory. Well, in my mind, or in my opinion, Your Honor, being a businessman and a personnel manager is not, you know, could be not completely. Well, it's not using your name as a reference if you're the personnel manager. Isn't that right? You're really working for them. That could be, Your Honor. Well, you could be. There's nothing to refute the IJ's conclusion. That could be, Your Honor. Is he still married to a U.S. citizen? They're separated, no, Your Honor. Okay. And there's no pending application for adjustment of status, I take it? At this point in time, no, Your Honor. Thank you. Okay. And I think it's also considered here as a political opinion imputed on the Petitioner, which is a ground for granting of asylum, Your Honor. And I think the service is also questioning that why did it wait for four months for him to receive the maroon, the black maroon? I think it's still within the reasonable period of time, Your Honor, to say that there's still fear of timing. Okay. Okay. Thank you. Any further questions? Thank you both for your arguments. The case just heard will be submitted. The next case on our oral argument calendar is Horner v. Farman. Julie Schumer for Petitioner.
judges: B. Fletcher, Noonan, Thomas